U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 JUL 28  AM 10: 05

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DAVID BAIN,                                    )
                                               )
     Plaintiff,                                )
                                               )
     v.                                        )       Case No. 5:15-cv-00202
                                               )
TRACY WREND, as Superintendent for             )
Lamoille South Supervisory Union and           )
Individually,                                  )
                                               )
     Defendant.                                )

**OPINION AND ORDER RE:**
**DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**
**(Doc. 7)**

Plaintiff, David Bain, brings this 42 U.S.C. § 1983 action against Tracy Wrend, in her official capacity as Superintendent for the Lamoille South Supervisory Union and her individual capacity. Plaintiff claims Defendant violated his federal constitutional rights during the course of his employment. Plaintiff also asserts state law claims of wrongful discharge in violation of public policy, violations of the Vermont Fair Employment Practices Act ("VFEPA"), and intentional infliction of emotional distress ("IIED").

Pending before the court is Defendant's motion to dismiss Plaintiff's First Amended Complaint (the "Amended Complaint") for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A hearing on the motion was held on May 18, 2016. For the reasons that follow, Defendant's Motion to Dismiss (Doc. 7) is GRANTED IN PART and DENIED IN PART.

## Background

The court accepts as true the allegations in Plaintiff's Amended Complaint and draws all inferences in Plaintiff's favor, as it must on a motion to dismiss. *See Littlejohn v. City of N.Y.*, 795 F.3d 297, 306–07 (2d Cir. 2015). However, the court emphasizes that by summarizing the

1

following alleged facts in this decision it expresses no judgment as to whether the allegations are actually true.

## I.    Plaintiff's Interactions with Defendant from 2008 to Early 2014

Plaintiff worked as a teacher at the Peoples Academy School from 1989 to 2014.  He taught a variety of subjects at both the middle and high school level, including computer technology and business.  Plaintiff also supervised student extracurricular programs and acted as a class advisor.  He "enjoyed a positive relationship with the school and its students, and was re-contracted for his position year-in and year-out from 1989 to 2014."  (Doc. 3 at ¶ 6.)

In 2008, Defendant became the Superintendent for the Lamoille South Supervisory Union.  According to the Amended Complaint, Defendant's administration began "targeting" certain teachers and administrative personnel for "inappropriate criticism and attack."  (*Id.* at ¶ 8.)  "[T]reatment of teachers was divided along a very clear line drawn between those who supported [Defendant] regardless of transgression, and those who expected [Defendant] to be held accountable for the discharge of her duties on behalf of the public," as well as between "those who the Superintendent believed had influence in the community and those that did not." (*Id.* at ¶¶ 9, 10.)  Specifically, Defendant "targeted and attacked those teachers and administrators who spoke out against matters affecting the public welfare; the proper administration of the school; and the health, safety and welfare of children." (*Id.* at ¶ 11.)

Sometime during that year, another teacher employed by the Lamoille South Supervisory Union was warned and directed not to have inappropriate contact with students, not to be alone with a child, and not to socialize with children outside of school.  Defendant "possessed information that the teacher violated these directives," and "addressed the situation by arranging for the transfer of the teacher from the Lamoille South Supervisory Union to another school district."[1]  (*Id.* at ¶¶ 15, 17.)  Plaintiff was a "vocal critic" of the way in which Defendant handled this situation.  (*Id.* at ¶ 19.)

---

[1] WCAX, a Vermont news organization, reported in 2011 that this teacher was convicted of aggravated sexual assault and related claims, and sentenced to twelve years in prison.  Jennifer Costa, *Former Vt teacher jailed for molesting students*, WCAX.com (Sept. 28, 2011), http://www.wcax.com/story/15565831/former-teacher-sentenced-today-for-sexual-assault-on-

Defendant's response to the 2008 episode "was not an isolated incident." (*Id.* at ¶ 20.) Rather, "[o]n multiple occasions, [Defendant] handled serious incidences according to [her] self-interest in preserving her appearance of competence, and shielding herself from scrutiny at the expense of the health, safety and well-being of students." (*Id.* at ¶ 21.) Plaintiff remained "a vocal critic" of Defendant's decision-making and the manner in which she handled these situations. (*Id.* at ¶ 24.) Other teachers, administrators, school employees, students, and parents "also questioned, addressed, and/or criticized [Defendant] for her actions, inactions, and misdeeds that threatened both student and teacher alike." (*Id.* at ¶¶ 31–32.) But Defendant's only response to "serious allegations" against her was to "put[] them aside," "cover[] them up," and "intimidate[e] . . . the complainant and anyone who criticized her actions," seeking instead to "shield [herself] from scrutiny," "hide problems at the schools," and "create the appearance of success where failure resided." (*Id.* at ¶¶ 34–35.)

Defendant's "targeting of her critics increased as her deficiencies became ever more prevalent," but Plaintiff "persisted" in his criticisms, and "became a vocal and active proponent in matters of public concern involving [Defendant]." (*Id.* at ¶¶ 36–37.) The school in which Plaintiff worked and that Defendant oversaw "was deeply affected by the misdeeds of [Defendant]," as "[t]eachers and administrators became incapable of performing their jobs for fear of retaliation for doing anything more than meekly supporting [Defendant's] decision-making, no matter how inappropriate." (*Id.* at ¶ 40.)

## II.     February 2014 Meeting and Subsequent Allegations Against Plaintiff

In February 2014, at a meeting "with other concerned school personnel," Plaintiff addressed issues related to Defendant's conduct, including "sweeping-under-the-rug allegations involving student abuse, teacher mistreatment, and proper administration being sacrificed to create the appearance of success." (*Id.* at ¶ 41.)

In the "wake" of this meeting, Plaintiff "became a full-blown target for a series of attacks by [Defendant] that ranged from trumped up innuendo to outright lies." (*Id.* at ¶ 42.) After

---

boys. The court may take notice of the story's publication. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (noting that "it is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contain[] certain information, without regard to the truth of their contents" (citations omitted)).

Plaintiff complained of another incident of student abuse and criticized Defendant's failure to address the problem, he was charged by Defendant for failing to report abuse. Though this allegation was "unfounded," (*id.* at ¶ 43), Defendant sent Plaintiff home from work as punishment. She did not investigate or punish the teacher who had engaged in the abuse, but rather "protect[ed]" that teacher and "[swept] the allegation under the rug." (*Id.* at ¶ 44.)

Sometime thereafter, Defendant alleged that Plaintiff was "grooming"[2] a student, despite there being "no legitimacy to this claim." (*Id.* at ¶ 46.)

## III.   Last Chance Agreement

On May 27, 2014, Plaintiff entered into a "Last Chance Agreement" (the "LCA") with the Morristown School District and the teacher's union.[3] The LCA stated that:

> As an alternative to the School District seeking [Plaintiff's] discipline (including potential discharge) for just cause (e.g., insubordination, failure to report a reportable incident under school policy and state law, interfering with a school investigation, unprofessional boundaries with a student, dishonesty with the administration and unprofessional behavior in communications with colleagues), [Plaintiff], the [union], and the School District have agreed to enter this   Last Chance Agreement as a "full, final, and complete resolution of the matter."

(Doc. 7-1 at 1.) The LCA called for Plaintiff's suspension without pay for ten days and required him to waive his rights to a disciplinary hearing to challenge the suspension. It also noted that the parties agreed it was Plaintiff's "last chance" and if he engaged in any misconduct or failed to follow all school policies and procedures going forward he would be terminated for "just cause." (*Id.* at 1–2.) Specifically, the LCA noted that all of Plaintiff's "communications and interactions with colleagues, students, and adults must be professional, respectful, and appropriate" going forward. (*Id.* at 1.)

---

[2] "Grooming" is a "term commonly used to mean cultivation of an inappropriate relationship with a child for a sexual purpose." (Doc. 13 at 9.)

[3] In ruling on a Rule 12(b)(6) motion, the court can consider documents incorporated within the complaint by reference. *See Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002) (citation omitted).

IV.     **Events Following Plaintiff's Signing of the LCA and Plaintiff's Termination**

After Plaintiff signed the LCA, Defendant began "engag[ing] in a pattern of nit-picking attack" on Plaintiff, so as to create a "false paper trail of [Plaintiff's] 'infraction[s]' and 'unprofessionalism.'"  (Doc. 3 at ¶ 52.)  Thereafter, Defendant alleged that Plaintiff had divulged confidential information regarding the grooming incident to another student, in violation of the terms of the LCA.  As a result, Plaintiff's employment was terminated in September 2014 after a hearing before the Morristown Board of School Directors (the "Board").[4]  Plaintiff, who was fifty-two years old at the time, was replaced by a "much younger and less qualified individual." (*Id.* at ¶ 67.)  Defendant "continued to attack and destroy [Plaintiff's] reputation" such that he has been unable to "obtain employment to which he is a qualified and suitable candidate."  (*Id.* at ¶ 62.)

## Analysis

Plaintiff brings his federal claims pursuant to 42 U.S.C. § 1983, which provides a civil claim against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution."  *See Kletschka v. Driver*, 411 F.2d 436, 448–49 (2d Cir. 1969) (purpose of § 1983 is to "provide a remedy when federal rights have been violated through the use or misuse of a power derived from a State.").

Defendant argues that Plaintiff released all of his present claims when he signed the LCA.  She also contends that the Amended Complaint does not adequately plead a First Amendment retaliation claim or a "stigma-plus" claim under the Due Process Clause of the Fourteenth Amendment.  Finally, should the court exercise its supplemental jurisdiction over Plaintiff's state law claims, Defendant argues that she is not a proper defendant.

---

[4] At oral argument, the parties agreed that Plaintiff was afforded this hearing prior to his termination.

## I.      Standard of Review

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard is not "akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

## II.     The LCA and "Waiver"

Defendant argues that Plaintiff resolved and released all of his present claims upon signing the LCA.  Plaintiff contends that the LCA is of no relevance to this case, as it includes no express waiver of civil liability in its provisions.[5]

In Vermont, enforceability of releases turns "on whether the language of the agreement was sufficiently clear to reflect the parties' intent."  *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 331, 670 A.2d 795, 797 (1995) (citations omitted).  "Releases must be specific in order to be valid and are interpreted narrowly, as a general matter."  *N. Sec. Ins. Co. v. Mitec Elecs., Ltd.*, 2008 VT 96, ¶ 20, 184 Vt. 303, 965 A.2d 447 (citation omitted).

---

[5] Plaintiff argues that the LCA has no relevance to his claims because it "arose from the relationship" between the school district and the teacher's union, which is governed by a "master agreement." (Doc. 13 at 30.)  He contends that this master agreement "delineates all grievances, procedures, [and] policies" between the parties, but "expressly excludes any and all claims 'involve[ing] a question of constitutional or civil rights' from its provisions." (*Id.*)  Plaintiff therefore argues that because the court was always the "envision[ed] . . . forum" for a "constitutional dimension lawsuit," (*id.*), the LCA cannot serve as a bar to his present claims.

The court does not need to make a ruling on this point given its other LCA findings.  Additionally, the master agreement is outside the scope of the Amended Complaint and is not appropriate for consideration on a motion to dismiss.  *See Perez v. Metro. Transp. Auth.*, No. 11 Civ. 8655(RWS), 2012 WL 1943943, at *6 (S.D.N.Y. May 29, 2012) ("It is well-settled that a [c]ourt cannot consider documents outside the pleadings on a Rule 12(b)(6) motion to dismiss unless the documents are incorporated by reference in the complaint or are integral to the complaint.").  It is also not a document in the public record.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998).

6

The LCA states that it is "a full, final, and complete resolution" of the "School District seeking [Plaintiff's] discipline . . . for just cause." (Doc. 7-1 at 1.) It goes on to say that if Plaintiff was to be terminated later for violating the LCA, he would be able to grieve his termination to the Board, but only on the issue of whether the conduct leading to his discharge actually occurred. By signing, he "expressly waive[d] any right to arbitrate (or otherwise challenge) any decision . . . to terminate [his] employment." (*Id.* at 2.)

The court is unable to conclude from the pleadings alone that Plaintiff intended to release Defendant from all civil liability when agreeing to the above provisions. The LCA functions as a settlement of the labor discipline process. In contrast to other cases in which courts have considered LCAs to be the equivalents of general releases, it is not clear or specific enough to immunize Defendant from Plaintiff's claims. *Cf. Taddeo v. Cty. of Niagara*, 413 F. App'x 397, 398 (2d Cir. 2011) (affirming summary judgment ruling that plaintiff was barred from bringing lawsuit contesting his termination where LCA expressly waived his right to any grievance, arbitration, or "other legal process"); *Malaney v. El Al Isr. Airlines*, No. 07 Civ. 8773(DLC), 2008 WL 126642, *1, 4–5 (S.D.N.Y. Jan. 4, 2008), *aff'd*, 331 F. App'x 772 (2d Cir. 2009), (plaintiff barred from bringing Title VII discrimination suit where release specifically discharged employer "from liability for variety of legal claims, including those under Title VII"); *Keen v. Brown*, 958 F. Supp. 70, 76–77 (D. Conn. 1997) (signing of LCA expressly waived any right to "file a civil action in any court or other body of competent jurisdiction"). Neither party claims that the LCA is ambiguous and neither offers parole evidence about the parties' intent. The court's review is limited to the language of the LCA which does not release the type of civil claims raised by this lawsuit.

The LCA cannot be interpreted to bar Plaintiff's surviving claims for another reason. It only expressly waived his right to challenge "any decision . . . to terminate [his] employment," (Doc. 7-1 at 2), and Plaintiff's surviving claims do not do that. As made clear by Plaintiff's counsel at oral argument and in opposition to this motion, Plaintiff's allegations are based upon a series of adverse employment actions that preceded his termination. Therefore, even if he was barred from challenging his termination in federal court, the LCA contains no provision restricting his right to hold Defendant liable for other adverse actions that he allegedly suffered

over the course of his employment.  As these other actions are the bases for Plaintiff's surviving claims, the court does not find them to be barred by the terms of the LCA.

## III.     First Amendment Retaliation Claim

To establish a claim of First Amendment retaliation, Plaintiff must show: (1) that "he has engaged in protected First Amendment activity," (2) that "he suffered an adverse employment action," and (3) that "there was a causal connection between the protected activity and the adverse employment action." *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007) (citation omitted).

### A.     Protected First Amendment Activity

It is well-established that "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  A two-part test is used to determine whether a public employee's speech is constitutionally protected. The court must inquire whether (1) "the employee spoke as a citizen on a matter of public concern," and, if so, (2) "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti*, 547 U.S. at 418 (2006)).

Whether speech is a matter of public concern is a question of law for the court, and "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 & n.7 (1983).  Speech that is focused on matters personal to the employee is not of public concern.  *See id.* at 147.  Speech that relates to "any matter of political, social, or other concern to the community" may qualify for First Amendment protection.  *See id.* at 146.  Even if speech touches on an issue of general importance, if it "primarily concerns an issue that is personal in nature and generally related to [the speaker's] own situation, such as his or her assignments, promotion, or salary, [it] does not address matters of public concern." *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (internal quotation marks and citation omitted); *see also Ruotolo*, 514 F.3d at 189 (court must ask whether speech was "calculated to redress personal grievances or whether it had a broader public purpose" (citation omitted)).

8

Here, Plaintiff's alleged speech—discussing the official misconduct of Defendant and how her policies ignored or jeopardized the health, safety, and well-being of students, as well as the rights of teachers— satisfies the requirement of public concern. These issues do not concern Plaintiff's own employment, but rather address broader issues of concern to the wider community. *See Connick*, 461 U.S. at 148 (noting that speech warrants protection when it "seek[s] to bring to light actual or potential wrongdoing or breach of public trust"); *Jackler*, 658 F.3d at 236 ("Exposure of official misconduct . . . is generally of great consequence to the public." (citation omitted)).

The second question, whether Plaintiff made these statements as a citizen or as an employee, is also primarily a question of law. *See Jackler*, 658 F.3d at 237. The *Garcetti* court explained that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. The nature of an employee's official duties is to be determined as a "practical" matter and not exclusively from "[f]ormal job descriptions." *Id.* at 424–25.

At the motion to dismiss stage, we take Plaintiff's factual allegations as true. While "courts have routinely held as a matter of law that a teacher's advocacy on behalf of [his] students falls squarely within [his] official duties as a teacher," *Ehrlich v. Dep't of Educ. of City of N.Y.*, No. 11 Civ. 4114(RMB)(KNF), 2012 WL 424991, at *3 (S.D.N.Y. Feb. 6, 2012), the Amended Complaint, though written at a very high level of generality, plausibly states a claim that Plaintiff was attempting to address troubling policies and broader wrongs within the school setting as a citizen, rather than pursuant to his official duties as an educator. *Cf. Huth v. Haslun*, 598 F.3d 70, 74–75 (2d Cir. 2010) (speech unprotected by First Amendment where plaintiff's lawsuit was only "related to her own situation," and there was "no suggestion . . . that her suit sought relief against pervasive or systemic misconduct by a public agency or public officials, or that her suit was part of an overall effort . . . to correct allegedly unlawful practices or bring them to public attention." (citation omitted)).

While it is true that Plaintiff made his statements on school property at a personnel meeting,[6] "[t]he inquiry into whether a public employee is speaking pursuant to [his] official duties is not susceptible to a brightline rule." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012). Whether Plaintiff is able to demonstrate that he was engaged in protected First Amendment activity will turn on what discovery reveals about the nature of his speech and professional duties. The Second Circuit has cautioned against making these assessments on the pleadings alone. In *Matthews v. City of N.Y.*, 488 F. App'x 532 (2d Cir. 2012), the Second Circuit remanded the district court's decision to grant the defendants' motion to dismiss. In so doing, the court explained that "[t]he record in this case is not yet sufficiently developed . . . to determine as a matter of law whether [the plaintiff] spoke pursuant to his official duties when he voiced the complaints." *Id.* at 533. The court explained that discovery was necessary as to "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id.* Here, while further record development may demonstrate that Plaintiff does not have a viable retaliation claim, construing the Amended Complaint in Plaintiff's favor as we must at this stage, his allegations satisfy the first prong of the test.

### B.    Adverse Employment Action

In opposing Defendant's motion to dismiss, Plaintiff does not contend that the adverse employment action taken against him was his eventual termination, but rather a number of preceding events.[7] Specifically, he complains of "adverse employment decisions, criticism, [and] reprimands" that took place after the February meeting. (Doc. 3 at ¶ 73.)

---

[6] Since *Garcetti*, some lower courts have developed additional, non-dispositive guidelines to assist in determining whether speech was made pursuant to a public employee's official duties. The Second Circuit has considered whether the speech was communicated through a procedure with a relevant "citizen analogue," meaning made through "channels available to citizens generally." *See Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 203–04 (2d Cir. 2010). Other relevant factors may include: "the plaintiff's job description; the persons to whom the speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment." *Kelly v. Huntington Union Free Sch. Dist.*, No. 09-CV-2101 (JFB)(ETB), 2012 WL 1077677, at *12 (E.D.N.Y. Mar. 30, 2012) (citation omitted). Courts may also consider whether the speech was made in the workplace and whether the speech concerned the subject matter of the employee's job. *See Garcetti*, 547 U.S. at 420–21.

[7] The court therefore does not consider Defendant's argument that Plaintiff's breach of the LCA broke the causal chain between his speech and his termination. (*See* Doc. 7 at 6–7.)

An "adverse action" in the context of a First Amendment retaliation claim consists of "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (citation omitted). Although "'[p]etty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims," *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)), the standard is "broad" and adverse actions may "take a wide variety of forms." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 120 n.14 (2d Cir. 2011) (citation omitted). Examples include "harsh measures" such as "discharge, refusal to hire, refusal to promote, reduction in pay, and reprimand," as well as "lesser sanctions" such as "demotion" and "express accusations of lying." *Wrobel v. Cty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (citation omitted). "[A]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014) (citation omitted); *see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." (citation omitted)). Ultimately, "whether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Zelnik*, 464 F.3d at 226 (citation omitted).

Here, Plaintiff claims that after the February meeting, Defendant: (1) began a series of "baseless" and "nit-picking" attacks against him, (2) spread "outright lies" about him, (3) wrongfully accused him of failing to report student abuse and excused him from work, (4) illegitimately charged him with being a "groomer," and (5) falsely accused him of divulging confidential information. (Doc. 3 at ¶¶ 42–44, 46, 48, 52–53, 55.) In the education context, the Second Circuit has held that similar actions might qualify as adverse. *See Bernheim v. Litt*, 79 F.3d 318, 324–26 (2d Cir. 1996) (noting that negative reviews and false accusations could constitute adverse employment actions); *see also Shanks v. Vill. of Catskill Bd. of Trs.*, 653 F. Supp. 2d 158, 166 (N.D.N.Y. 2009) (holding that "systematic course of verbal harassment, threats, ostracism and generally demeaning behavior," which included "false charges based upon misrepresentations," was "enough to establish adverse employment action under a 'critical mass'

11

theory" (citations omitted)).  The Amended Complaint pleads sufficient facts to satisfy this prong of Plaintiff's retaliation claim.

### C.   Causal Connection

Lastly, Plaintiff must demonstrate a causal connection between the protected speech and the adverse actions.  Plaintiff need only show that the activity was "at least a substantial or motivating factor in the adverse employment action." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 130 (2d Cir. 2013) (citation and brackets omitted).  Plaintiff may "establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (citation omitted).

Here, Plaintiff alleges that many of the adverse actions began "[i]n the wake" of the union meeting.  (Doc. 3 at ¶ 42.)  While there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001), courts "uniformly hold that the temporal proximity must be very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks and citation omitted).  "[C]ase law in the Second Circuit . . . often finds a limit at two or three months and almost universally disapproves longer time periods." *Adams v. Ellis*, No. 09 Civ. 1329(PKC), 2012 WL 693568, at *16 (S.D.N.Y. Mar. 2, 2012) (citations omitted).  Therefore, while Plaintiff may not be able to make out a retaliation claim as to the accusation that he broke school confidentiality policies, which happened about seven months after the February meeting, it is plausible that the necessary temporal link exists between his speech and some of the other adverse actions that he alleges took place earlier. *Compare Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 435, 446–47 (2d Cir. 1999) (one month gap sufficient for causation inquiry), *abrogated on other grounds by* 548 U.S. 53 (2006), *with Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275–76 (S.D.N.Y. 2007) (seven or eight month gap too long); *but see Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (eight month gap supported showing of causation).

Additionally, Plaintiff has alleged facts indicating disparate treatment, which can also indirectly support a claim of causation. *See Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Whereas Plaintiff contends that he suffered a series of adverse employment actions for his alleged misconduct, he identifies at least one other instance in which a teacher who also engaged in misconduct was not punished, but rather shielded from scrutiny instead. (Doc. 3 at ¶¶ 43–45.) While facts developed in discovery will permit the court to better assess whether this theory of causation is viable in the instant case, Plaintiff has made the showing necessary to defeat the instant motion.

Accepting all allegations as true and drawing all inferences in Plaintiff's favor as the court must at this stage, the Amended Complaint sufficiently alleges the final element of a prima facie case of retaliation. The motion to dismiss is therefore denied as to Plaintiff's First Amendment retaliation claim.[8]

## IV.    Stigma-plus Claim

Plaintiff also raises a "stigma-plus" claim under the Due Process Clause of the Fourteenth Amendment. "There is a constitutional right to be free from a false stigmatizing statement if it is coupled with the 'deprivation of a tangible interest[.]'" *Casey v. Pallito*, Case No. 5:12-cv-284, 2016 WL 96157, at *8 (D. Vt. Jan. 7, 2016) (quoting *Algarin v. Town of Wallkill*, 421 F.3d 137, 138 (2d Cir. 2005)). Injury to one's reputation alone is insufficient. The Second Circuit has explained:

> To establish a 'stigma plus' claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights. This state-imposed alteration of status or burden must be in addition to the stigmatizing

---

[8] The court makes no ruling on the issue of Defendant's qualified immunity. Defendant did not raise this affirmative defense alongside her opposition to Plaintiff's substantive claims, but rather only gave it cursory mention when discussing her "view" of the LCA. (*See* Doc. 7 at 4.) Moreover, qualified immunity is seldom awarded at the motion to dismiss stage. *See Huminski v. Rutland Cty.*, 148 F. Supp. 2d 373, 375 n.1 (D. Vt. 2001) ("[T]he affirmative defense of qualified immunity generally cannot support a grant of a Rule 12(b)(6) motion to dismiss because the defense requires an investigation into the facts and evidence not available at this early stage of the pleadings." (citing *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976))). This issue remains for decision after the factual record is developed.

> statement.   Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process.

*Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) ("[D]eleterious effects flowing directly from a sullied reputation, standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." (internal quotation marks, citation, and brackets omitted)).   A plaintiff must also show the stigmatizing statements were made public.   *See Abramson v. Pataki*, 278 F.3d 93, 101– 02 (2d Cir. 2002) (citations omitted).   "If a plaintiff successfully proves his stigma-plus claim, due process requires that as a remedy he be given a post-deprivation opportunity to clear his name."   *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 & n.12 (1972)).

Here, Plaintiff grounds his stigma-plus claim on Defendant's statement that he was a "groomer" (the stigma) and his ultimate termination (the "plus").   He claims that this statement "foreclosed him from other employment opportunities" and that he has been "deprived of government benefices as a result." (Doc. 3 at ¶¶ 83, 88.)   He does not claim that he was fired without "just cause" (i.e. he does not contest the fact that he was found to have violated the LCA at a pre-termination hearing), and he is not seeking reinstatement.[9]   Rather, he seeks a name-clearing hearing and "recovery for the deprivation of his rights" under § 1983.   (*Id.* at ¶ 95.)

Plaintiff has pled sufficient facts to support many of the elements of a stigma-plus claim.   Unquestionably, the allegation that Plaintiff was cultivating an inappropriate relationship with a child as a "groomer," qualifies as stigmatizing, as it "call[s] into question [his] good name, reputation, honor, or integrity." *Patterson*, 370 F.3d at 330 (internal quotation marks and citation omitted).   Such an allegation would be highly stigmatizing and damaging to a school teacher and his career prospects. *See id.* (explaining that statements that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to

---

[9] Accordingly, though Plaintiff was a "just cause" school employee, the court examines his stigma-plus claim only as it relates to his reputational interests, and not his interest in continued employment at the Peoples Academy School.

14

practice his or her profession" may fulfill stigmatizing statement requirement (citation omitted)). Plaintiff has also alleged that this statement was false, as required.

Plaintiff was also undeniably deprived of more than just a "tangible interest" when terminated, as he had an actual property interest in his position. Plaintiff was not an at-will employee, but rather could only be fired if his "performance was deficient and/or there was just cause for reprimand and termination." (Doc. 3 at ¶ 79.) *See Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002) ("A public employee has a property interest in continued employment if the employee is guaranteed continued employment absent 'just cause' for discharge" (citation omitted)).

Though it is not clear from the Amended Complaint whether the "groomer" statement was ever made public, (*see* Doc. 3 at ¶ 81), the court need not make a finding on this point as Plaintiff's stigma-plus claim fails for another reason. He cannot demonstrate that his "liberty was deprived without due process of law." *Segal v. City of N.Y.*, 459 F.3d 207, 213 (2d Cir. 2006); *see DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (plaintiff must show he suffered injury and deprivation "*without adequate process*" (emphasis added)). "[A] stigma-plus claim enforces a limited but important right: the right to be heard 'at a meaningful time and in a meaningful manner.'" *Segal*, 459 F.3d at 213 (citing *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). Here, Plaintiff was provided with an opportunity for a pre-deprivation hearing at which he could have cleared his name of the grooming allegations. He decided to waive this opportunity "knowingly and voluntarily" after receiving "full, fair, and adequate representation from the [union]," and acknowledged that he had had the opportunity to consult with counsel before doing so. (Doc. 7-1 at 2.) This pre-termination hearing presented Plaintiff with a procedurally adequate opportunity to protect his reputation and professional interests.

Plaintiff's waiver of this opportunity to clear his name defeats his stigma-plus claim. As made clear by Second Circuit precedent, "[a] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Hefferan v. Corda*, 498 F. App'x 86, 88–89 (2d Cir. 2012) (denying stigma-plus claim where plaintiff-teacher failed to take advantage of hearing opportunity or establish that adequate process had not been available). In *Segal*, the Second Circuit denied a stigma-plus claim where an employee similarly failed to avail herself of

15

a hearing opportunity. *See* 459 F.3d at 216, 218.  As the hearing would have provided the plaintiff with "extensive procedures . . . sufficient to safeguard [her] reputational and professional interests," no additional name-clearing hearing was required.  *See id.* at 213–218. As "the availability of adequate process defeats a stigma-plus claim," *id.* at 213, and Plaintiff was presented with a sufficient opportunity to clear his name, his stigma-plus claim is not viable. *See also Monserrate v. N.Y. State Senate*, 599 F.3d 148, 159–60 (2d Cir. 2010) ("a sufficient opportunity to clear [one's] name . . . is all the constitution requires" for stigma-plus claim). Accordingly, Defendant's motion to dismiss Plaintiff's stigma-plus claim is granted.[10]

## V.      State Law Claims

The court has discretion to exercise supplemental jurisdiction over Plaintiff's state-law claims.  *See Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 416 n.22 (D. Vt. 2009) (citing 28 U.S.C. § 1367(a)).  The court elects to do so, as these claims are substantially related to his federal cause of action and arise from the same set of facts.

---

[10] The court notes that Plaintiff's stigma-plus claim is weak for another reason.  As explained by the Supreme Court in *Paul v. Davis*, 424 U.S. 693, 710 (1976), a stigma-plus hearing is not required if a state-employer defames an employee "who *continues to be an employee*" (emphasis added).  The Second Circuit has interpreted *Paul* to require "a concurrent temporal link" between the stigma and the deprivation.  *See, e.g., Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994) (five month gap between publication of defamatory statements and deprived interest was too long).  Here, while it is not clear from the Amended Complaint when exactly the grooming statement was made or published (if it was published), it happened sometime after the union meeting in February 2014 and sometime before Plaintiff signed the LCA in May 2014, meaning between four and seven months before Plaintiff was terminated in September 2014. This gap in time suggests that the necessary nexus between the defamation and termination might be lacking.  *See Kirby v. Yonkers Sch. Dist.*, 767 F. Supp. 2d 452, 465 (S.D.N.Y. 2011) (necessary temporal nexus lacking where allegedly defamatory statements were made six months prior to plaintiff-teacher's termination).  Additionally, the Amended Complaint does not allege that the Board either explicitly or implicitly adopted the grooming allegation when terminating Plaintiff for violating the LCA.  *See Tucker v. Decker*, File No. 1:14-cv-163-jgm, 2016 WL 1171529, at *5 (D. Vt. Mar. 23, 2016) (explaining that sufficient proximity exists between the "stigma" and the "plus" where "the stigma and plus appear, to a reasonable observer, connected and the actor imposing the plus explicitly or implicitly adopted the stigmatizing statements" (citing *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005))).  Ultimately, the court need not decide this point, as even if the statements did sufficiently implicate Plaintiff's liberty interest, Plaintiff *was* offered a pre-termination name-clearing hearing and declined to utilize the process.

Defendant argues that Plaintiff's state law claims should be dismissed because she is not the proper defendant for them. The court agrees with this assessment for Plaintiff's claim of wrongful discharge in violation of public policy. Defendant did not terminate Plaintiff's employment. Rather, he was terminated by decision of the Board. *See* 16 V.S.A. § 1752(h); *see also Wyatt v. City of Barre/Barre City Fire, Dep't*, No. 2:11-CV-00297, 2012 WL 1435708, at *3–4 (D. Vt. Apr. 25, 2012) (claims of wrongful discharge in violation of public policy cannot be brought against individual supervisors, but must be brought against employer). However, Plaintiff's claims of a VFEPA violation and IIED survive Defendant's motion.

### A.    VFEPA Claim

Plaintiff claims Defendant violated the VFEPA by discriminating against him on the basis of his age and sex. *See* 21 V.S.A. § 495(a)(1). Defendant argues that she is immune from liability because the claim asserted against her is based on her actions as superintendent, and, under Vermont law, such a claim can only be asserted against the municipality for which she worked. Assuming Defendant is right that the position of superintendent falls within the ambit of 24 V.S.A. § 901 and 24 V.S.A. § 901a, Defendant would only be immune from liability to the extent she was acting within the scope of her employment, or executing her official duties. *See Wyatt*, 2012 WL 1435708, at *8–9 (discussing § 901); 24 V.S.A. § 901a(b).

Presently, it is unclear whether Defendant's alleged acts fell within the scope of her official duties. The court notes that Plaintiff has the burden of proving that Defendant's conduct was outside the scope of her employment, and this burden is high. Defendant cannot be held liable simply because Plaintiff feels she acted unfairly or exhibited poor judgment when making decisions as the superintendent. But the Amended Complaint alleges that Defendant subjected Plaintiff to a series of adverse employment actions not based upon "good faith administrative decision making," but due to a "retaliatory" and "malicious animus," that was "impermissibly related to [his] age and sex." (Doc. 3 at ¶¶ 113, 115.) Taken as true, the Amended Complaint states a claim that Defendant was acting outside the scope of her employment. *See Wyatt v. City of Barre*, 885 F. Supp. 2d 682, 692–93 (D. Vt. 2012) (motion for judgment on the pleadings on VFEPA claim denied where it was unclear whether fire chief was acting pursuant to his official duties at all times given that Complaint alleged he investigated plaintiff "solely to harass and

embarrass her"). As further development of the factual record is needed on this issue, Defendant's motion to dismiss is denied as to Plaintiff's VFEPA claim.

### B.   IIED Claim

Defendant's motion to dismiss is also denied as to Plaintiff's IIED claim. The protection afforded to municipal employees under Vermont law does not extend "to an act or omission . . . that was willful, intentional, or outside the scope of the employee's authority." 24 V.S.A. § 901a(e). There is no doubt that a claim of IIED requires a showing of an intentional or willful act. *See Sheltra v. Smith*, 136 Vt. 472, 476, 392 A.2d 431, 433 (1978) (noting that IIED claim requires proof of "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." (citation omitted)). The Amended Complaint alleges that Defendant intentionally (or with reckless disregard) engaged in extreme and outrageous conduct to cause Plaintiff to suffer emotional distress. (Doc. 3 at ¶¶ 119, 121.) Accordingly, Defendant is not immune from this cause of action and her motion to dismiss Plaintiff's claim of IIED is denied.

### Conclusion

For the reasons stated above, Defendant's Motion to Dismiss for Failure to State a Claim (Doc. 7) is GRANTED IN PART and DENIED IN PART. The court grants Defendant's motion as to Plaintiff's stigma-plus claim, as well as his wrongful discharge in violation of public policy claim, and denies it as to Plaintiff's First Amendment retaliation, violation of the VFEPA, and IIED claims.

Dated at Rutland, in the District of Vermont, this 28 day of July, 2016.

Geoffrey W. Crawford, Judge
United States District Court