U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 NOV 14 PM 12: 15

CLERK
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DAVID BAIN, )
)
    Plaintiff )
)
v. )   Case No.: 5:15-cv-202
)
TRACY WREND, )
)
    Defendant. )

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 47)

Plaintiff David Bain brings this employment case against Tracy Wrend, superintendent of the Lamoille South Supervisory Union ("LSSU"). Plaintiff is a former teacher employed by LSSU. He seeks damages for wrongful termination.

In his November 23, 2015 amended complaint, plaintiff alleged that Defendant violated his First, Fifth and Fourteenth Amendment rights ("stigma plus") and the state-law claims of wrongful discharge in violation of public policy, the Vermont Fair Employment Practices Act ("VFEPA"), and intentional infliction of emotional distress ("IIED"). (Doc. 3.)

This court has previously granted Defendant's motion to dismiss in part. The court dismissed the due process- stigma plus claim as well as his claim for wrongful discharge in violation of public policy. The claims which survived the motion to dismiss are claims for First Amendment retaliation (Count I), violation of the VFEPA (Count IV), and the claim for IIED (Count V). (Doc. 22.) These claims are back before the court on Defendant's motion for summary judgment.

# FACTS

Plaintiff was employed as a teacher at the Peoples Academy in Morristown, Vermont from 1989 until 2014. Peoples Academy serves high school and middle school students from the Morristown area and nearby communities. It is one of seven schools within the LSSU.

People's Academy Middle Level School hired Defendant Tracy Wrend as a special educator in 1988. She was appointed Superintendent of the LSSU in 2007. In that role, she plays a significant role in the disciplining of teachers. At her deposition, she described it as

> [ranging] from everything to supporting Principals in the supervision process, reviewing and gathering information about potential areas where there's a question about teachers' performance that may require discipline. It includes making some disciplinary determinations and making sure that information and a recommendation is provided to the Board when that's an appropriate step in the process.

(Doc. 52-3 at 47.)

In his 25 years as a high school teacher, Plaintiff taught a variety of subjects including business topics and computer technology. He was also an active member of the Vermont National Education Association ("NEA"). He served as the union representative for other teachers involved in disciplinary proceedings. He served in a variety of leadership roles in the union including as an executive committee member, building representative for teachers accused of disciplinary violations, union treasurer, and delegate to regional union meetings. He served for at least 10 years on the Grievance Committee.

In the course of discovery in this case, Plaintiff has described his conviction that Defendant Wrend treats older teachers and staff members unfairly. He identified several teachers whom he believes she forced out of school employment. He believes she concealed several incidents because they could reflect badly on the school administration. His dissatisfaction with Defendant Wrend also has origins in his belief that she mishandled the Shaun

Bryer incident in which an elementary school teacher left employment at one of the LSSU schools for a job in another school district and was later convicted of sexual abuse of students at LSSU. It is safe to conclude that by 2014, Plaintiff was known to be a vocal critic of Ms. Wrend's leadership.

In February 2014, Plaintiff and union president Barbara Brody invited other union members to his classroom for a private meeting. At the meeting, he addressed his concerns and criticisms of Defendant Wrend. He states that he "spoke out against and laid out the pattern of abuse, targeting and bullying of the Superintendent." (Doc. 52-2 at 15.) In response, as he describes it, "[t]o a person, everyone at the meeting expressed reluctance and then unwillingness to address these issues because they feared retaliation by the Superintendent." (*Id.*)

At his deposition, Plaintiff testified that he advised the other teachers that he was considering running for president of the union following Ms. Brody's retirement. (Doc. 47-2 at 25.) He and other members of the Executive Committee discussed the possibility of a no-confidence vote against Superintendent Wrend. (*Id.*) According to Plaintiff, the other members of the Executive Committee were too intimidated by Superintendent Wrend to support a no-confidence vote even though they believed it to be appropriate. (*Id.*)

Plaintiff attributes the professional discipline he experienced during the spring and summer of 2014 to retaliation by Defendant Wrend against him for the views he expressed at the meeting in February 2014.

In the spring of 2014, Plaintiff was the subject of discipline by the school administration for failing to maintain appropriate professional boundaries with a student, failing to comply with the mandatory reporting requirement for a potential incident of abuse, dishonesty, insubordination and communicating inappropriately with a colleague. (*See id.* at 15–18.) The

3

facts underlying these proceedings have two distinct aspects. After allegations surfaced that another teacher had struck a student on the arm, Plaintiff was investigated for failing to report the incident. The other teacher was not disciplined because the incident was not very serious. The more significant incident concerned allegations of favoritism and improper treatment extended to a student who was a close friend of Plaintiff's daughter, also a student at the school. The friend was permitted to attend Plaintiff's study hall in company with Plaintiff's daughter and received other signs of favor and special status from Plaintiff. Plaintiff was accused of "grooming" his daughter's friend by treating her in a familiar, unprofessional manner.[1]

Plaintiff did not contest these alleged violations through the grievance process. Instead, he accepted a 10-day suspension without pay and signed a "Last Chance Agreement" in which he waived his right to contest termination in the case of a future violation. (*Id.* at 16–18.)

In the summer of 2014, during the holiday, Plaintiff engaged in a casual conversation with a student in a grocery store in which he disclosed the name of the student involved in the "grooming" incident. The disclosure was a violation of student confidentiality. Under the terms of the Last Chance Agreement, his employment was terminated for this conduct in August 2014. The same conduct resulted in a public reprimand issued by the Vermont Agency of Education, which is the Vermont licensing authority for teachers. He did not contest either the termination of his employment or the licensure proceeding.

Plaintiff now denies that he committed the violations which resulted in the Last Chance Agreement. In his view, the discipline he received, including the 10-day suspension, was motivated by Superintendent Tracy Wrend's anger about statements he made at an informal meeting of members of the Executive Committee of the teacher's union on February 24, 2014.

---

[1] Plaintiff was also accused of personal use of a school camera. This matter was quickly resolved and did not result in any discipline.

4

Plaintiff believes that he was targeted for discipline by Defendant because he hosted the meeting and because he expressed interest in becoming the next union president. (*Id.* at 25–26.) He does not know whether Superintendent Wrend learned about the meeting and his role in it, but he suspects that she did because the disciplinary proceedings followed it so closely in time. (*Id.* at 26.)

In addition to the meeting on February 20, 2014, Plaintiff believes that Superintendent Wrend bore him ill will because of criticism he expressed concerning her role as a school administrator in the Shaun Bryer incident. He does not know whether Superintendent Wrend learned of his criticism. (*Id.* at 28.) He suspects that she may have learned about what he said from friends in the NEA. (*Id.*)

## Analysis

### I. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court "construe[s] the evidence in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018).

### II. Claim of Retaliation in Violation of the First Amendment (Count I)

In order to succeed in his claim of retaliation for exercising his right to free speech under the First Amendment, Plaintiff must establish that (1) his speech addressed a matter of public concern; (2) he suffered an adverse employment action; and (3) there was a causal connection between the speech and the adverse employment action. *See Mt. Healthy City Sch. Dist. Bd. of*

5

*Educ. v. Doyle*, 429 U.S. 274, 283–87 (1977); *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003).

### A. Public Concern

In *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), the Supreme Court held that in many circumstances, teachers and other public employees retain their First Amendment rights to speak out on public issues. At the same time, the Court recognized that public employers such as school districts have legitimate grounds to exercise authority, including termination of employment, over teachers whose speech crossed the line from public debate to insubordination. The Court described the need to reconcile these two interests. "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568. The Court recognized the "enormous variety of fact situations in which critical statements by teachers and other public employees may be thought . . . to furnish grounds for dismissal" and rejected any "attempt to lay down a general standard against which all statements may be judged." *Id.* at 569. Instead, the Court undertook a painstaking review of the truth and falsity of the teacher's statements, the employer's opportunities to rebut these statements in the public forum, and the absence of evidence that the statements affected the teacher's work in the classroom.

Subsequent Supreme Court decisions have developed two principles expressed in *Pickering*. These are that the speech for which constitutional protection is sought must be a matter of public concern and that the employee be speaking as a citizen and not as an individual concerned with his or her private interests. *See Perry v. Sindermann*, 408 U.S. 593 (1972)

6

(professor's public criticism of superiors on matters of public concern may be constitutionally protected); *see also Connick v. Myers*, 461 U.S. 138, 147 (1983) ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review [the employee's discharge].").

The Supreme Court has repeatedly emphasized and in its own decisions demonstrated that the determination of whether employee speech is protected requires a careful examination of the facts. In *Connick*, the Court defined "a matter of public concern" as one that "relat[es] to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. The Court held that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48. The Court's decisions in this area have frequently involved its own detailed review of the circumstances under which the statements were made.

Most recently, in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Court reemphasized the distinction between statements addressing public concerns and those which relate to the workplace and the teacher's obligations to the school and her pupils. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens" for purposes of the First Amendment. *Id.* at 412. *See also Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014) ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.") Because schools are very much in the public eye and a matter of intense public concern, the distinction between the statements of a teacher as a citizen and as a professional is often very fine.

Plaintiff makes two First Amendment retaliation claims. His primary claim is that his actions in hosting and speaking out at a meeting of the union executive committee at which the other members declined to proceed with a vote of no confidence against the school superintendent motivated the disciplinary action against him. More broadly, he alleges that he was known to be critical of Defendant Wrend's leadership and decision-making since her appointment in 2007.

In denying Defendant's motion to dismiss, the court previously ruled that the amended complaint sufficiently alleged that Plaintiff spoke out on matters of public concern and that he did so in the capacity of a citizen and not just in support of his personal interests as an employee. (Doc. 22 at 9–10.) These issues remain largely unchanged in the context of the summary judgment motion. Defendant has now supplied interrogatory answers and deposition testimony which describe his concerns about Defendant Wrend's leadership. The interrogatory answers are broader and include much more detail than the deposition testimony about the February 2014 meeting, but in both he describes a wide-ranging discussion of "the poor working relations, the hostile work environment, things that were happening with teachers, what are our options." (Doc. 47-2 at 25.) In both, he describes himself as a leader in convening the meeting and expressing criticism of Defendant Wrend.

The court remains persuaded that the statements by Plaintiff at the February 2014 relate to matters of public concern. There is no allegation that he addressed actions taken against him or conditions on the job which affected him as an individual. The criticism he directed against Defendant Wrend and his advocacy of a district-wide vote of no confidence concern the governance of the district as a whole, not his individual employment. The cases relied upon by Defendant—including *Smith v. Beaufort County School District*, No. 9:06-0185-CWH, 2008 WL

821809 (D.S.C. Mar. 25, 2008); *Connolly v. City of Rutland*, No. 2:09-CV-183, 2011 WL 3739064, at *18 (D. Vt. Aug. 24, 2011); *Kantha v. Blue*, 262 F. Supp. 2d 90 (S.D.N.Y. 2003), and *Adam v. New York State Education Department*, 705 F. Supp. 2d 298 (S.D.N.Y. 2010)—all concerned communications about the plaintiff's own work conditions and his or her particular dispute. In contrast, Plaintiff here made no complaint about his own circumstances. His dissatisfaction was with Defendant's leadership in a broad sense and in particular with his belief that important issues of accountability for student safety were being concealed from public scrutiny.

Plaintiff's statements more closely resemble those of plaintiff in *Montero v. City of Yonkers, New York*, 890 F.3d 386 (2d Cir. 2018), in which the court recognized the special status of speech at union meetings. Such speech typically falls outside of the scope of the duties of employment and for this reason may qualify as the speech of a citizen. *See also Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999) (activities of a union faction in criticizing management raised matters of public concern); *Gardetto v. Mason*, 100 F.3d 803 (10th Cir. 1996) (plaintiff's efforts to obtain a no-confidence vote qualified as a matter of public concern).

In addition to establishing that he spoke as a private citizen, Plaintiff must also establish that his statements concerned matters of public interest. "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" *Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008) (quoting *Lewis v. Cowen*, 165 F.3d 154, 163–65 (2d Cir. 1999)).

The record evidence before the court on summary judgment establishes both that Plaintiff spoke as a citizen and that the content of his speech concerned matters of public interest. At the time of the February 2014 meeting, Plaintiff was not yet the subject of disciplinary action. So far

as the court is aware, he was a high school teacher in good standing. He had no complaint about his own treatment. He spoke as a prospective candidate for union presidency about issues of concern to the other union members present. His remarks more closely resemble those of a citizen than an employee. The issues he addressed, including the treatment of other, more senior teachers, were of general community concern. He addressed his perception of the management style of the defendant, including "the entire pattern of hiding facts, circumstances, and important issues at the school from parents, teachers, administrators and students." (Doc. 52-2 at 15.) Accepting Plaintiff's account of the meeting as true, the court concludes that the broad, critical discussion of the superintendent was a matter of public concern.

### B. Adverse Action

In analyzing whether the defendant retaliated against Plaintiff's expression of views by taking an adverse employment action, the court seeks to distinguish between the adverse action—termination following a disciplinary proceeding—and the closely related issue of causation. There can be little doubt that Plaintiff suffered an adverse action. During the spring and summer of 2014, he was accused of failing to file a timely report of the "hitting incident," engaging in what Defendant described as "grooming-like behaviors, and reflective of unprofessional conduct and/or unprofessional boundaries with a student," (Doc. 52-3 at 8), misuse of a school camera to take photos of a soccer match, and, ultimately, the breach of professional confidence.

These actions led to his "last chance" status which led in turn to his termination when he committed a second violation. The actions taken against Plaintiff by Defendant Wrend, including his termination, were clearly adverse employment actions. The more difficult question

is whether there is sufficient evidence to go to the jury that these actions were caused by a desire to retaliate against his protected statements.

## C. Causation

Plaintiff must also produce record evidence which, if believed, would show that protected speech was "a substantial motivating factor in the adverse employment action." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006). There is no direct evidence of causation such as a statement by Defendant that she was responding to statements made at the February meeting. Such direct evidence would be unusual. The circumstantial evidence of improper retaliation rests principally in the timing of the disciplinary actions. "A plaintiff may establish causation indirectly by showing his speech was closely followed in time by the adverse employment action." *Id.* at 168. Plaintiff also argues that other teachers who were critical of Defendant were discharged on "trumped up charges." (Doc 52-2 at 22.)

The court turns to the record evidence concerning causation. Following the February meeting, Plaintiff was the subject of four disciplinary inquiries. The first appears to be the incident in which a teacher named Marc Ducharme was investigated for hitting another student. Plaintiff supplies his version of these events in his answers to interrogatories. He states that during the first week of May 2014, he reported a lunchroom incident he had learned about from another teacher. An investigation revealed that the underlying incident was not serious and no action was taken against Mr. Ducharme. Although Plaintiff alleges that Defendant "accused [him] of insubordination, and failing to report an incident," it appears that no disciplinary action resulted. (Doc. 52-2 at 37.) A second concerned the use of a school camera. These incidents could not support a finding of causation because they were minor in nature and resolved without any consequences to Plaintiff.

11

The final incident giving rise to discipline is the breach of student confidentiality which led immediately to Plaintiff's termination. This incident occurred six months after the February meeting. Plaintiff has never questioned his mistake in disclosing one student's name to another about a confidential matter. Nor has he questioned the lawfulness of his termination under the "last chance" agreement. This incident cannot possibly be viewed as retaliation for statements he made at the February meeting.

The "grooming" incident is different. Plaintiff states that in the weeks following the February meeting, Defendant "made up and pressed an allegation—with nothing to back it up—that I was a 'groomer.'" (Doc. 52-2 at 16.) He describes several disciplinary meetings with Defendant at which she accused him of having "five of the six characteristics of a 'Groomer.'" (*Id.* at 37.) This incident concerned the friend of Plaintiff's daughter. It was resolved through execution of the "last chance" agreement.

The essential facts giving rise to the disciplinary proceeding are not in dispute. There is no dispute that Plaintiff treated the student in a solicitous, favorable manner. He describes the relationship as entirely innocent and intended to assist her. The school administration took a dimmer view and, in effect, placed him on probation.

In *Mt. Healthy*, the Supreme Court recognized that causation is not present if the defendant is able to prove that there were other, sufficient reasons for the adverse employment action. *See Mt. Healthy*, 429 U.S. at 287. "In a dual motivation case, the plaintiff must prove that an invalid reason motivated the adverse action; if the plaintiff sustains that burden, then the defendant has the opportunity to prove, as an affirmative defense, that it would have taken the adverse action in the absence of the invalid reason." *Holo-Krome Co. v. N.L.R.B.*, 954 F.2d 108, 110 (2d Cir. 1992).

Like *Mt. Healthy*, this case is a dual motivation case. Plaintiff seeks to draw an inference that the "grooming" investigation and discipline occurred so close in time to the February meeting that Defendant was motivated by his statements to retaliate against him. Closeness-in-time is recognized in the case law as a common basis for such an inference of improper motive. On the other hand, there is substantial agreement between the parties that the grooming incident was not a fabrication. Plaintiff did treat one of the students with special concern. It is entirely possible that the incident was serious enough to have resulted in the "last chance" resolution without any animus or retaliatory intent by Defendant.

As this discussion illustrates, the issue of causation depends upon the inferences drawn by the fact-finder from the facts. Each party has the burden of proof on a different aspect of the question. Although the facts themselves as they relate to the grooming incident are not disputed, the inference which should be drawn from them is. Because it is uncertain whether Plaintiff can persuade the fact-finder that Defendant acted in retaliation to his speech and whether Defendant can show that the school board would have imposed the "last chance" agreement anyway, the retaliatory discharge claim is unsuited to a resolution through summary judgment. The court DENIES the motion for summary judgment on Count I.

### III. Vermont Fair Employment Act Claim (Count IV)

Plaintiff also seeks to recover on grounds of discrimination on the basis of his age and sex. He relies upon the Vermont Fair Employment Act, 21 V.S.A. § § 495 *et seq.* ("VFEPA").

#### A. Suit Against an Individual Defendant

In contrast to Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, a suit for money damages against an individual defendant is permitted under the VFEPA. *Payne v. U.S. Airways, Inc.*, 2009 VT 90, ¶¶ 7–21, 186 Vt. 458, 987 A.2d 944. But

naming a municipal employee such as the superintendent of a unified school district raises additional potential problems: 24 V.S.A. §§ 901 and 901a both provide limited immunity from suit against individual employees. For the reasons discussed below, the court concludes that the limited immunity is no impediment in this case.

Section 901a of Title 24 has no application because it contains an exception for conduct that was "willful, intentional, or outside the scope of the employee's authority." 24 V.S.A. § 901a(e). Discrimination on the basis of age or gender would fall within the exception.

Section 901 of Title 24 has given rise to more controversy. In *Gallipo v. City of Rutland*, 173 Vt. 223, 789 A.2d 942 (2001), the Vermont Supreme Court affirmed the dismissal of a municipal fire chief from a VFEPA claim because 24 V.S.A. § 901 requires such claims to be brought against the municipality itself. In *Wyatt v. City of Barre*, No. 2:11-CV-00297, 2012 WL 1435708 (D. Vt. 2012), and *Wyatt v. City of Barre*, 885 F. Supp. 2d 682 (D. Vt. 2012), the federal district court declined to dismiss a VFEPA claim against a municipal fire chief because it determined that § 901 did not apply to actions which lay beyond the scope of the chief's employment. The claims of harassment brought against the chief in his individual capacity would fall outside of the scope of his employment. *See Coon v. Town of Springfield, Vt.*, 404 F.3d 683 (2d Cir. 2005) (purpose of § 901 is to require suits against municipal officers acting in their official capacities to be brought against the municipality). In this case, the claims of gender and age discrimination also fall outside the scope of Defendant's employment. Claims against Defendant as an individual are not barred by § 901.

### B. Merits of VFEPA Claim

The court turns to the merits of the VFEPA claim. Such claims are subject to the burden-shifting analysis developed in the context of Title VII civil rights litigation. *Hodgdon v.*

14

*Mt. Mansfield Co.*, 160 Vt. 150, 624 A.2d 1122 (1992). Plaintiff bears the initial burden of producing sufficient evidence to support a prima facie case of discrimination. He has done so by virtue of his age plus the factual assertions that other employees were the subject of age discrimination. (Plaintiff makes little effort to develop his alternative claim that he was the subject of gender discrimination as a male; without any record evidence offered at all, the court dismisses that claim out of hand.)

The burden then shifts to the defendant to demonstrate a non-discriminatory basis for the adverse action which in this case was plaintiff's investigation and discipline. Defendant has met this burden through undisputed evidence that Plaintiff was investigated and disciplined for showing unprofessional favoritism to a student. Similarly, Defendant has shown a non-discriminatory basis for Plaintiff's termination in the undisputed facts concerning the violation of student confidentiality.

The burden of production returns to the plaintiff to show that the reason offered was a false pretext which conceals discriminatory conduct. On this final step in the analysis, Plaintiff falls short. There is no proof whatsoever that either of the teacher discipline proceedings which resulted in his termination were pretextual. Plaintiff did not contest either proceeding. There is no dispute that his conduct in favoring his daughter's friend was the type of conduct that a school superintendent should investigate. Following the investigation, Plaintiff did not dispute the conclusion that he had violated school policy. He accepted the probationary status which the defendant imposed on behalf of the school board. He offers no evidence that the discipline proceeding was trumped up or unwarranted. In similar fashion, he makes no claim that the breach of student confidentiality did not occur or that his termination was not authorized by his "last chance" agreement.

The court GRANTS summary judgment on Count IV.

## IV. Intentional Infliction of Emotional Distress (Count V)

The record evidence does not support the claim that the defendant acted in an outrageous manner sufficient to cause severe emotional distress. The evidence before the court is that the defendant rejected two disciplinary complaints as unworthy of further action (the "hitting" and camera incidents) and conducted an investigation and imposed discipline regarding the two more serious complaints.

In *Cate v. City of Burlington*, 2013 VT 64, 194 Vt. 265, 79 A.3d 854, the Vermont Supreme Court considered an IIED claim by a former city employee. The employee claimed that the disciplinary complaints against him were politically motivated. The Vermont Supreme Court rejected the employee's claims for two reasons.

First, the employer's subjective motive was irrelevant. "The standard for outrageousness is objective. Therefore, an employer's conduct must be assessed with an objective standard based on the employer's actions and words, not on what the employee personally believed motivated the employer's conduct." *Id.* ¶ 28 (citation omitted).

Second, the conduct itself was limited to conducting an investigation of the employee's conduct and imposing disciplinary measures. The conduct was insufficiently extreme and very different from the misconduct by the employer in *Crump v. P&C Food Markets, Inc.*, 154 Vt. 284, 576 A.2d 441 (1990), which included summoning plaintiff to a lengthy meeting without notice, continuing it without a break for rest or food, and repeatedly badgering him to amend and sign a statement.

In this case, Plaintiff's claim is entirely one of subjective retaliation. That may be sufficient to establish a prima facie case under § 1983, but it is not enough to meet the higher

level of objective misconduct required by the state law IIED claim. There is no claim that Plaintiff was mistreated in the course of the investigation or the disciplinary proceeding. His claim is that these measures resulted from his speech—not that he was subjected to outrageous conduct during the proceedings themselves.

For these reasons, the court GRANTS the motion for summary judgment on Count V.

## CONCLUSION

The court GRANTS summary judgment in favor of the defendant on Counts IV and V. The court DENIES the motion for summary judgment on Count I.

Dated at Rutland, in the District of Vermont, this 14 day of November, 2018.

Geoffrey W. Crawford, Chief Judge
United States District Court