UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DAVID BAIN,                                          )
                                                     )
    Plaintiff,                               )
                                                     )
    v.                                       )          Case No. 5:15-cv-202
                                                     )
TRACY WREND, as Superintendent for                   )
Lamoille South Supervisory Union and                 )
Individually,                                        )
                                                     )
    Defendant.                               )

**DECISION AND ORDER ON DEFENDANT'S MOTION FOR JUDGMENT
NOTWITHSTANDING THE VERDICT ON BASIS OF QUALIFIED IMMUNITY
(Doc. 123)**

From September 9, 2019 through September 11, 2019, the court conducted a jury trial in

this Section 1983 case. Plaintiff David Bain claimed that he was subjected to retaliation by

defendant Tracy Wrend for the exercise of his First Amendment rights when he was suspended

from his work as a high school teacher and subjected to an investigation based on allegations of

improper "grooming" conduct with a female student. At all times relevant, Defendant Wrend

was the Superintendent of the Lamoille South Supervisory Union school district which employed

Bain as a teacher.

On September 11, 2019, the jury returned a plaintiff's verdict awarding $75,000 in

compensatory damages and $75,000 in punitive damages. (Doc. 115.)

Prior to trial, the court and the parties agreed that the court would make a determination

on the issue of qualified immunity following trial on the basis of the trial evidence. On October

16, 2019, Defendant Wrend filed a motion for judgment notwithstanding the verdict on the basis

of qualified immunity.  (Doc. 123.)  Plaintiff Bain filed a response.  (Doc. 128.)  Defendant has filed her reply.  (Doc. 129.)

## I.       Procedure for Ruling on the Defense of Qualified Immunity

Defendant first raised the defense of qualified immunity in her motion to dismiss. (Doc. 7 at 4.)  She claimed that when Plaintiff signed the "Last Chance Agreement" ("LCA"), which brought the grooming investigation to a close, he waived any right to challenge the decision to terminate his employment following a later incident of misconduct.  (*Id.*)  This argument included an assertion of qualified immunity.  "Moreover, this view of the LCA is objectively reasonable.  Accordingly, as a government official, Ms. Wrend is entitled to qualified immunity."  (*Id.*)

In response, Plaintiff limited his retaliation claim to the damages he sustained as a result of the grooming investigation.  He claimed that the investigation and resulting LCA comprised the adverse employment action on which his claim rested.  "…[Plaintiff] does not complain of the termination, he complains about the false accusations, illegitimate scrutiny, intimidation, coercion and punishment directly following the meeting he convened in the Spring of 2014." (Doc. 13 at 20.)  He did not pursue a wrongful termination claim.  This limitation of the claim rendered the defense of qualified immunity to a claim of wrongful discharge moot.  The court declined to rule on the qualified immunity issue but stated that the issue would "remain[] for decision after the factual record is developed."  (Doc. 22 at 13 n.8.)

The next dispositive motion was for summary judgment.  (Doc. 47.)  Defendant did not raise the defense of qualified immunity at that time.  Instead, the court and the parties addressed the elements of the three claims which remained after the court's order on the motion to dismiss.

The summary judgment ruling narrowed the case to one of retaliation for exercise of First Amendment rights. (Doc. 62.)

In preparation for the jury trial, the court issued a ruling outlining a variety of legal issues and requesting a response from the parties. (Doc. 81.) The ruling included the following paragraph concerning qualified immunity:

> The defense has raised qualified immunity as a defense. (*See* Doc. 7 at 4; Doc. 25 at 8.) The court anticipates that it will not charge the jury on qualified immunity. Instead, in the event of a jury verdict in favor of the plaintiff, it will issue a ruling on qualified immunity on the basis of the trial testimony and any additional briefing. If either side has a different view, the court wishes to hear it immediately.

(Doc. 81 at 6.)

Both sides accepted this procedure, and the jury instructions contain no reference to the defense of qualified immunity. Instead, as anticipated, Defendant raised the issue by motion (*see* Doc. 123) following the return of the verdict and prior to entry of final judgment (which still has not occurred).

The court will follow the procedure described in its August 14th Entry Order. The court accepts the factual findings made by the jury in its verdict form. These are that Plaintiff engaged in protected speech and suffered retaliation by Defendant as a consequence. The retaliation took the form of initiating an investigation which led to his suspension and the "last chance agreement." (Doc. 115.) These findings do not exclude the qualified immunity defense. The qualified immunity defense requires the court to answer two different questions:

- whether Defendant's decision to initiate an investigation into Plaintiff's conduct violated a clearly established constitutional right, and

- whether a person in Defendant's position would have reasonably believed that her acts did not violate Plaintiff's rights.

## FACTS

The court begins with a review of the facts established at trial.

Until his discharge in 2014, Plaintiff was a long-serving high school and middle school teacher at Peoples Academy which is the public high school for Morrisville, Vermont. He was hired in 1989 as a business teacher. (Doc. 124 at 38.) He later obtained a license endorsement in computer technology and taught computer science courses at the high school. (*Id.* 38–39.) He was an active member of the local teacher's union, serving as a building representative, treasurer, and a member of various union committees. (*Id.* 40–42.)

Plaintiff has known Defendant since 1997 when Defendant started as a teacher in the middle school. The two families have daughters of the same age who are friends, and the families themselves were friendly. (*Id.* 45–46.) The relationship changed when Defendant was appointed as superintendent of the Lamoille South Supervisory Union which oversaw schools in Morrisville, Vermont and adjacent communities.[1] Plaintiff became a vocal critic of Defendant, whom he believed was forcing older teachers into retirement. (*Id.* at 51–53.)

Defendant agreed that the parties' relationship soured after she became superintendent. She attributed the problem to an incident when she wrote a disciplinary letter of warning to Plaintiff concerning his role in joining with students in singing a popular song about drugs and alcohol in a school video. (Doc. 125 at 35.) After she issued the letter, she believes Plaintiff began to turn his back on her in public and refused to interact appropriately. (*Id.* at 136–37.)

---

[1] Defendant is now the superintendent of the Lamoille South Unified Union (LSUU). The LSUU was formed as part of a state-wide restructuring process after the events at issue here. The changes in the structure of the school districts makes no difference to the merits of this case. At all times relevant, Defendant was the most senior school administrator responsible for oversight of Peoples Academy where Plaintiff served as a high school teacher. (Doc. 125 at 115–17.)

In February 2014, Plaintiff called an informal meeting of union members in his classroom after school hours. He spoke at length about his perception that Defendant was mistreating senior staff. He proposed a vote of no confidence among the teachers. No one else supported this measure. He then announced his decision to run for local union president to draw attention to his concerns. (Doc. 124 at 64–75.)

Word of the February union meeting reached Defendant. She testified that the union president and a member of the union executive committee told her that Plaintiff raised concerns about her leadership at a union meeting. (Doc. 126 at 6–7, 101.)

The critical events giving rise to this case started on Saturday, May 3, 2014. Plaintiff's high school-age daughter attended Peoples Academy. On Saturday, she had her best friend over for a sleepover.[2] Plaintiff overheard the girls talking about an incident at school at which Marc Ducharme, another teacher, hit the best friend in the arm, not hard enough to cause injury but hard enough to make her say "ouch." (Doc. 124 at 80.) The incident occurred because the best friend and her companions were not paying attention in class. The best friend told Plaintiff that her parents knew about the incident and were very upset. (*Id.*)

Plaintiff did nothing about the incident over the weekend. When he returned to school on Monday, May 5, he talked to Jim McDonald, whom he described as the "head of discipline", and to Michelle Walker, the school secretary, about the incident. (*Id.* at 81.) He told them there was a hitting incident in Mr. Ducharme's room. He said the same thing to teacher Mike Dolan. (*Id.* at 83.)

---

[2] Because both girls were minors at the time of the incident, the court will not identify either. The court will describe Plaintiff's daughter's friend as "her best friend."

On May 5, the best friend's mother send an email to the high school principal Phil Grant expressing concern about the hitting incident and asking the school to investigate it. (Defendant's Ex. C.)

On Tuesday, May 6, Mr. McDonald told Plaintiff that others at the school believed that Plaintiff was stirring up trouble for Mr. Ducharme and attempting to make the school look bad by talking about the hitting incident. (*Id.* at 84.)

On Thursday, May 8, Plaintiff received a letter summoning him to a meeting with the superintendent to discuss "your communication and involvement regarding a recent situation between Marc Ducharme and a student." (Defendant's Ex. E.) Plaintiff met with Defendant the same day. Defendant asked him who had told Plaintiff that the administration suspected him of stirring up trouble. Plaintiff declined to give Mr. McDonald's name. (Doc. 124 at 89.)

Defendant's notes and recollection of the meeting are a little more complete. She testified that Plaintiff told her he spoke to three teachers about the hitting incident. (Doc. 125 at 155–56.) She agreed with Plaintiff that he did not disclose his conversation with Mr. McDonald.

On May 9, Plaintiff received a second letter from Defendant. The letter criticized him for failing to disclose "who was reporting information to you and you declined to answer on multiple occasions, with full acknowledgment that you may be subject to disciplinary action for insubordination in failing to do so." (Defendant's Ex. H.) Defendant explained that "this impacts our ability to investigate and respond in a timely fashion and also may have the impact of compromising the well-being of students and the mission of our school system." (*Id.*)

That same day, Plaintiff received permission from Jim McDonald to disclose his name to Defendant. (Doc. 124 at 91.)

On May 12, Defendant sent Plaintiff a letter suspending him from his teaching duties "pending further review of possible unprofessional communication, insubordination, and preferential treatment to a female student."  (Defendant's Ex. L.)

On May 15, Plaintiff received a letter from Defendant requesting a meeting on the same day.  (Defendant's Ex. R.)  At the meeting, Defendant advised Plaintiff that her investigation now concerned potential sexualized grooming of a female high school student whom Plaintiff permitted to spend time in his classroom.[3]  Plaintiff was shocked by the accusation.  He testified:

> [The accusation] was horrible.  It came out of left field.  [The Student] is another friend of my daughter's.  Again, my daughter's a 16 year old junior at Peoples Academy.  And she's friends with [the Student].  And then Tracy starts asking -- she asked if I -- she asked if I'm having a sexual relationship with [the Student].  And she asked if I give [the Student] preferential treatment.  She says, does [the Student] and I text or Facebook each other?  And the answer to all those questions was no.

(Doc. 124 at 94.)

Understanding why Defendant investigated Plaintiff's relationship with the Student requires some additional explanation.  As the computer teacher, Plaintiff's classroom adjoined the computer lab.  He was also the long-time advisor to the student yearbook project.  As a result, students were in and out of his classroom on a more frequent and informal basis than a conventional classroom teacher.  (*Id.* at 96.)

At trial, the Student testified that during the spring semester of 2014, the Student transferred her study hall from Mr. Ducharme's room to Mr. Bain's.  (Doc. 125 at 92–93.)  She discussed the move with her guidance counselor and the school secretary.  (*Id.* at 93.)  In Plaintiff's testimony, he explained that in the spring of 2014, the Student was experiencing psychological difficulties and had a specialized support team.  (Doc. 124 at 152.)  Although he

---

[3]  The court will refer to the young woman as "the Student."

was not involved in her support plan, he allowed her to spend her study hall time in his room. (*Id.* at 151–52.)  On one occasion he bought her a pizza in an effort to reduce her use of profanity.  (*Id.* at 153.)

When Defendant met with Plaintiff on May 15, she discussed the Student's presence in his room and her concern that the Student was scheduled to be elsewhere in the building.  (Doc. 126 at 8–9.)  At trial, Defendant described her concerns about the Student as an interference with the school's support plan for the Student and the violation of attendance rules.  (*Id.* at 9.)  She also spoke of her concern that the pizza reward sent the Student the wrong message about the use of profanity.  She denied suspecting Plaintiff of grooming the Student for sexual reasons.

The suspicion of grooming quickly petered out.  On May 12, 2014, before questioning Plaintiff about the matter, Defendant filed a report of suspected child abuse with the Vermont Department of Children and Families.  She both called and submitted a written report.  She identified "concerns …that David Bain, in his role as teacher, is demonstrating preferential treatment and unprofessional boundaries with a student… He has ordered pizza with/for her, allows her to be in his room when she's not to be there, and has conflicts with colleagues about the privileges he has extended to her.  She is a sometime friend of his same-aged daughter." (Defendant's Ex. K.)  DCF declined to investigate.  Neither Defendant nor anyone else from the school ever contacted the Student or her family to investigate further.

In Defendant's view, the areas of concern and potential discipline which she was investigating included insubordination for failing to disclose Mr. McDonald as the person who told Plaintiff the administration was investigating him, failure to report the Ducharme incident within 24 hours as required by state law, interfering with a school investigation, unprofessional

boundaries with a student, dishonesty with the administration and unprofessional behavior in communicating with employees.  (Defendant's Ex. X.)

On May 16, 2014, Plaintiff sent Defendant an email asking to return to school and offering to accept any terms and conditions including a "Last Chance Agreement."  Plaintiff agreed to discuss a resolution.  (Defendant's Ex. U.)  The parties entered into the LCA on May 27, 2014.  Plaintiff accepted a 10-day suspension without pay and returned to work. (Defendant's Ex. X.)

During the summer vacation after the end of the school year, Plaintiff encountered a former student in a local store.  The student asked him whether he had been suspended on suspicion for grooming and whether the Student was the suspected victim.  He answered with an affirmative gesture -- a meaningful shrug -- which a member of the public reported to the school. (Doc. 124 at 191.)  He did not contest his dismissal under the LCA for this violation of student confidentiality.  He was terminated by the school board in September 2014.  (Defendant's Ex. KK.)

## JURY VERDICT

In its verdict, the jury found that Defendant retaliated against Plaintiff by initiating disciplinary action.  The jury found that Defendant's actions were in response to speech by Plaintiff which was protected by the First Amendment.  The retaliation was a "substantial motivating factor in causing the disciplinary action which led to his suspension and the "last chance" agreement.  The jury found that Plaintiff's conduct at work would not have led to his investigation in any event.  (Doc. 115.)

The jury awarded $75,000 in compensatory damages and an equal amount in punitive damages. In awarding punitive damages, the jury followed jury instructions which conditioned such an award on a finding of malicious or reckless conduct. (Doc. 113.)

## I.      Legal Standard for Qualified Immunity

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the Supreme Court established the modern doctrine of qualified immunity. In overruling its previous decision in *Wood v. Strickland*, 420 U.S. 308 (1975), the Court established an objective standard:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly statutory or constitutional rights of which a reasonable person would have known.

*Harlow*, 457 U.S. at 818.

The doctrine requires consideration of whether a reasonable person would have considered her actions to be lawful both in light of the clearly established law *and* on the basis of the information she possessed when she engaged in the conduct at issue. *See Anderson v. Creighton*, 483 U.S. 635, 642 (1987); *Saucier v. Katz*, 533 U.S. 194, 202 (2001)[4]. "As a general rule, police officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994). The court exercises discretion in choosing the order in which these questions are addressed. *Pearson v. Callahan*, 555 U.S. 223 (2009).

---

[4]  The court acknowledges that *Saucier's* two-step analysis is "no longer [ ] regarded as mandatory." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Nevertheless, in some instances, the analysis continues to be "beneficial." *Id.* This is such a case.

These inquiries are distinct. The first requires a survey of established law to determine whether "[t]he contours of the rights [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. It is purely a question of law. *Kerman v. City of New York*, 374 F.3d 93, 108 (2d Cir. 2004).

The second issue arises even if the right at issue was established in prior decisions. The court must also consider whether "it was objectively reasonable [for the defendant] to believe" that her conduct did not violate a clearly established right. *Hurlman v. Rice*, 927 F.2d 74, 78 (2d Cir. 1991). This second issue presents a mixed question of fact and law and "has its principal focus on the particular facts of the case." *Id.* at 78–79. The defendant has the burden of proof. *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). The court accepts the facts found by the jury. As the court's discussion below illustrates, it was unnecessary to make additional factual determinations based on the trial testimony.

## II.    Clearly Established Constitutional Right

In this case, the court turns first to the question of whether the right asserted in this case—the right to recover for the consequences of a workplace investigation driven by retaliatory motives—was clearly recognized in the spring of 2014 when the events at issue took place.

To determine whether a constitutional right is "clearly established" for purposes of qualified immunity, courts consider if  "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (alterations in original) (internal quotation marks omitted).

**A. Defining the Law with Reasonable Clarity**

The right of public school teachers and other public servants to exercise their First Amendment rights without retaliation by their employer has long been recognized by the Supreme Court. *See Pickering v. Board of Educ. of Twp. High School Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968). This constitutional right has limits. It must be balanced against the legitimate interest of the government in regulating the speech of its employees. *See Connick v. Myers*, 461 U.S. 138, 142 (1983).

In the context of Section 1983 damage claims, the Supreme Court has defined the balance between free speech and legitimate regulation by limiting the protected speech of public employees to matters of public concern, not expressed pursuant to their official duties and subject to consideration of the employer's interest in efficient operations. The Second Circuit has identified the following elements of a prima facie claim of First Amendment retaliation:

- Plaintiff's speech addressed a matter of public concern;
- Plaintiff suffered an adverse employment action;
- There was a causal connection between the speech and the adverse employment action.

*See Mandell v. Cty. of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003). The defendant may avoid liability by proving that it would have taken the adverse employment action in the absence of protected speech, *Mt. Healthy City School District Board of Educ. v. Doyle*, 429 U.S. 274 (1977), or that plaintiff's speech was likely to disrupt government's actions. At trial in this case, the elements of the prima facie case and the Mt. Healthy defense were all submitted to the jury. The potential defense of disruption was not a trial issue because the speech occurred in a gathering of teachers outside of school hours.

The general outlines of the cause of action for First Amendment retaliation by public employees were clearly established for several decades before the events giving rise to this

lawsuit in 2014.  The narrow issue presented in this case by the qualified immunity defense is whether by the spring of 2014, case law clearly established that commencing a workplace investigation in retaliation for protected speech could qualify as an adverse employment action. (*See* Defendant's Motion for Qualified Immunity (Doc. 123 at 4) ("At issue in this qualified immunity motion is whether Plaintiff suffered an adverse employment action").)

Defendant argues that case law has not clearly established an investigation of an employee for on-the-job misconduct as an adverse employment action.  She identifies a line of trial court decisions holding that an investigation which does not lead to disciplinary action cannot provide the basis for a Section 1983 claim.  *See Radolf v. Univ. of Conn.,* 364 F. Supp. 2d 204, 225 (D. Conn. 2005); *Jaeger v. North Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 227-28 (E.D.N.Y. 2016).  Defendant also brings to the court's attention cases which recognize the right of the employer to refer a case for criminal investigation, *Boylan v. Arruda*, 42 F. Supp. 2d 352 (S.D.N.Y. 1999), or to conduct fact finding sessions outside of the realm of employee discipline.  *Tepperwien v. Entergy Nuclear Operations, Inc*., 663 F.3d 556, 568 (2d Cir. 2011) (investigation was not disciplinary in nature and was initiated for good reason).

Both parties direct the court's attention to the decision of the Second Circuit in *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139 (2d Cir. 2014).  In *Cox*, the Second Circuit affirmed a decision granting summary judgment against a claim that an investigation prompted by the employees' own claims of racial discrimination could support a Title VII retaliation claim. "An employer's investigation of an EEOC complaint alleging racial harassment without more— that is, without additional particularized facts evidencing a retaliatory intent and resulting in, or amounting to, adverse job consequences for the complainant—cannot sustain a valid retaliation complaint."  760 F.3d at 146.  The court distinguished between employer factfinding which

occurred without adverse consequences to the employee and a retaliatory investigation. "[W]e quickly add that an employer's investigation may constitute a cognizable retaliatory action if carried out so as to result in a hostile work environment, constructive discharge, or other employment consequence of a negative nature, or if conducted in such an egregious manner as to dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 147 (internal quotations marks omitted).[5]

The court draws several conclusions from the cases cited by both sides. It is clear that an investigation which does not result in workplace discipline does not qualify as an adverse employment action. But the converse is also true. An investigation, launched for retaliatory reasons, may qualify as an adverse employment action. The Second Circuit described both sides of this coin in the *Cox* decision.

The *Radolf* ruling provides a second example. *Radolf* included a First Amendment retaliation case. Following plaintiff's efforts to expose what he viewed as mishandling of grant funds by university staff and faculty, plaintiff's employer subjected him to an internal

---

[5] The court recognizes strong parallels between the elements of a claim of retaliation for the exercise of First Amendment rights and the similar claim of retaliation for making a claim of discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a), and similar statutes. An adverse employment action for purposes of the First Amendment is defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006). The legal standard is essentially identical for retaliation against claims of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (prima facie case requires a showing that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination") (internal quotation marks omitted). In both settings, the critical factor is whether the defendant's retaliatory conduct was sufficiently consequential as to deter a reasonable person from engaging in protected conduct. Because of the close doctrinal similarity, the court considers cases arising in both the First Amendment and the discrimination contexts to determine whether the law was clearly established that an investigation resulting in workplace discipline or other serious consequences could satisfy the element of adverse employment action.

investigation of his own use of such funds.  The investigation "concluded that there was no basis for a finding that [plaintiff] had committed fraud or other improper conduct in connection with [the grants in question]."  *Radolf*, 364 F. Supp. 2d at 223.  The court held that an investigation resulting in exoneration could not be considered an adverse employment action.  "[Plaintiff] could not cite a single case in which a court had held that mere participation in an internal investigation—standing alone, without allegations of attendant material disadvantage in employment terms—could support a First Amendment retaliation claim.  Indeed, case law on this subject holds precisely the opposite."  *Id.* at 224.  The *Radolf* opinion recognized "the consistent line of case law requiring, as a condition to a finding of adverse employment action, that the plaintiff have suffered some material change in employment terms or conditions as a result of the conduct of an investigation."  *Id.* at 225.

*McInnis v. Town of Weston*, 375 F. Supp. 2d 70 (D. Conn. 2005), provides another example, arising in the context of age discrimination.  In *McInnis*, the trial court ruled that a workplace investigation resulting in a three-day suspension could qualify as an adverse employment action for purposes of a retaliation claim.  The trial court rejected plaintiff's claim that "the initiation of an investigation, without more, is itself an adverse employment action." 375 F. Supp. 2d at 84.  But in the case of an investigation which resulted in a three-day suspension, the court ruled that such an investigation could satisfy the requirement of an adverse employment action.  "A jury reasonably could find that the discipline to which plaintiff was subjected was the culmination of a series of internal investigations that began on the very day [plaintiff] threatened an age discrimination lawsuit, linking [his letter] and the discipline throughout the seven month time frame."  *Id.* at 85.

A second principle is that a referral to a third-party such as a police department for investigation of work-place conduct is not an adverse employment action. *See Boylan*, 42 F. Supp. 3d at 357. The detective's inquiry may not be welcome, but it occurs outside of the context of employment relations. Similarly, an inquiry undertaken by an employer for reasons other than workplace discipline may not qualify as an adverse employment action. *Tepperwien*, 663 F.3d at 568 (employer's "fact-finder" investigations were not disciplinary in nature and did not result in any sanction).

The court follows the *Cox* decision and the examples set by *Radolf* and *McInnis* in concluding that case law now establishes with reasonable clarity that an investigation which results in workplace discipline may qualify as an adverse employment action. Each court that has addressed the issue has identified retaliatory investigations which lead to workplace discipline as adverse employment actions. That these statements frequently appear as dicta in cases in which there were no negative consequences does not erase their function as accurate statements of the law. An employer who retaliates by launching an investigation leading to employee discipline may be subject to the same liability as an employer who imposes the discipline in retaliation directly without the intermediate step of initiating an investigation. *Cox* expresses this conclusion, and it is reflected in the trial court decisions described above.

**B.  Recognition by the Second Circuit or the Supreme Court**

The court turns to the question of when this principle was established. The general principle that a public employer may not punish its employees for the exercise of their First Amendment rights has been established since the Supreme Court decision in *Pickering*. *See Johnson v. Ganim*, 342 F.3d 105 (2d Cir. 2003); *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201 (2d Cir. 2002). The development of a body of case law defining the conditions under which an

investigation may satisfy the element of an adverse employment action is more recent. The *Cox* decision issued in 2014, a few months *after* the investigation at issue in this case. *Radolf* and *McInnis* both issued in 2005. All three recognize that a retaliatory investigation that leads to an adverse consequence at work may give rise to liability. Other recent discussions of the topic include *Everitt v. DeMarco*, 704 F. Supp. 2d 122 (D. Conn. 2010), which is limited to an analysis of cases—including *Radolf* and *McInnis*—that stand for the proposition that an investigation without negative consequences for the employee is not an adverse employment action.

The court is satisfied that prior to 2014, trial court decisions within the Second Circuit recognized that a retaliatory investigation leading to workplace discipline qualified as an adverse employment action. The Second Circuit recognized this principle in 2014 in the *Cox* decision a few months after the events in question. The out-of-circuit cases it relied upon as authority were cases which arose within the context of discrimination—not the First Amendment—but these included *White*, 548 U.S. 53 (conduct giving rise to liability for purposes of Title VII is not confined to activities in the workplace), *Velikonja v. Gonzales*, 466 F.3d 122 (D.C. Cir. 2006) (lengthy investigation diminishing prospects for career advancement could satisfy requirements of Title VII for conduct dissuading a reasonable employee from making or supporting a charge of discrimination), and *Rhodes v. Napolitano*, 656 F. Supp. 2d 174, 187 (D.D.C. 2009) (length and scope of investigation and tone of Letter of Counseling meet "material adversity" requirement of *White*).

No decision cited by either party describes the distinction between retaliatory investigations, which coupled with serious consequences may qualify as adverse employment consequences and investigations which lead to no action or exonerate the employee as a recent development. This distinction was well-developed in the context of Title VII for many years

before 2014. The distinction was accepted by the Second Circuit in 2014 in the *Cox* decision. It was recognized before that by trial courts within the Second Circuit. The court concludes that the definition of adverse employment action included retaliatory investigations prior to the events of this lawsuit in the spring of 2014.

### C. Reasonable Defendant Would Have Understood From the Existing Law That Her Conduct Was Unlawful

Defendant's qualified immunity argument is focused on the element of adverse employment action. "She reasonably believed that investigating Plaintiff's alleged misbehavior did not violate Plaintiff's right to be free from an adverse employment action in retaliation for protected speech." (Doc. 123 at 5.) Defendant obviously does not argue that she could not have known that retaliating against speech was wrong. An employee's general protection against retaliation for exercising his First Amendment rights has been long established. *See Pickering*, 391 U.S. 563. Instead, it is the particular form in which the retaliation is alleged to have taken place—initiating an investigation as opposed to issuing a suspension or terminating employment—which Defendant identifies as the source of uncertainty and misapprehension.

The court addresses Defendant's reasonable understanding and belief about whether her actions were lawful in two related contexts. Here, the issue is whether the law itself was established with sufficient certainty that a reasonable person in Defendant's position would understand its contours. Later the court will address whether Defendant's conduct was objectively reasonable. *See Outlaw*, 884 F.3d at 367 ("Where the right at issue in the circumstances confronting [defendant] was clearly established but was violated, the officer will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights"). The court will treat that question separately. *See infra* Section III.

The court addresses Defendant's reasonable understanding of the law first as it concerns the general prohibition against retaliation. It has long been established that a supervisor in Defendant's position cannot retaliate against free speech, even if it gives offense, by imposing discipline such as suspension or termination. The variation in this case is whether a reasonable person would understand that conducting an investigation for purposes of retaliation which leads to discipline alters the outcome.

The court is satisfied that a reasonable person would understand that if she were driven by retaliatory motives in opening an investigation of a subordinate and then imposing discipline, she could be held responsible for any resulting harm. Such a belief would be consistent with case law developed in cases like *Cox*. It is unsurprising that an investigation carried out for an improper purpose could lead to liability. A reasonable defendant holding a management position would understand that while she has the right and obligation to investigate potential misconduct, she is at risk of liability if her reasons for doing so are rooted in a desire to retaliate against criticism and to discourage free speech among the employees she supervises.

The court concludes that at the time of the events at issue here, the law was clearly established that a workplace investigation, motivated by retaliation against protected speech, could result in a finding of liability.

## III.    Defendant's Reasonable Understanding

The court turns to the second qualified issue whether the facts as developed at trial and determined by the jury support a finding that a reasonable defendant in the position of Defendant Wrend would have believed that her acts did not violate Plaintiff's rights. Because this is a mixed question of fact and law, it is one which could have been submitted to the jury. In this case, the parties and the court agreed that the qualified immunity question would be resolved by

a post-trial motion.  The court does not write on a clean slate.  In considering what a reasonable defendant would have understood whether her conduct was unlawful, the court places itself in Defendant's position, subject to the factual findings already made by the jury.  A reasonable defendant would have known the following:

Plaintiff engaged in protected speech at an informal union gathering.  Plaintiff was highly critical of Defendant who was not present.  He called unsuccessfully for a vote of no confidence. Defendant learned about this speech and as a result initiated a retaliatory investigation several months later.  This investigation included an inquiry into Plaintiff's delay in reporting an account of a classroom incident in which another teacher struck a student until Plaintiff returned to school on Monday, as well as his decision to report the event to a school administrator in place of the Department of Children and Families.  Within days, the investigation grew to include an allegation that Plaintiff was engaged in an inappropriate and possibly sexual relationship with a different student as well as concerns that he interfered with the investigation of the incident by discussing it with other faculty members and was insubordinate in declining to disclose the names of everyone with whom he discussed the incident.  Following several face-to-face meetings with Defendant, Plaintiff accepted a suspension without pay and agreed to a probationary "Last Chance Agreement."  The jury found that Defendant acted with sufficient malice to justify a punitive damage award.

For purposes of determining qualified immunity, the court accepts the jury's determination that "plaintiff's statements cause[d] defendant to retaliate against him by initiating disciplinary action."  (Doc. 115, question 3.)  The court also accepts the finding that the retaliation and subsequent disciplinary action was a substantial factor in causing Plaintiff's damage and that his conduct at work would not otherwise have led to his investigation.  (*Id.* at

questions 5, 6.)  Finally, the court accepts the jury's finding that Defendant acted with malice or in reckless disregard of Plaintiff's rights as these terms were defined in the charge.  (Doc. 113 at 9).  The court recognizes that Defendant has the burden of proof on the issue of her reasonable understanding.

Viewed through this lens, a reasonable person in Defendant's position would not believe that her actions were lawful.  A reasonable person would understand that retaliating against protected speech by initiating multiple lines of investigation against Plaintiff leading to a "last chance agreement" violated his right to speak out at the union gathering.  These determinations are supported by the evidence at trial which described a flurry of investigations, launched simultaneously by Defendant, immediately followed by the imposition of probationary status.  The two sides disagreed sharply over the question of retaliatory motive, but there was little doubt that the investigations followed one upon the next in short order and led to Plaintiff's discipline after 25 years of service with few prior complaints.

The court is satisfied that a reasonable person in Defendant's position would have understood that her actions were unlawful.  Defendant has not established the defense of qualified immunity.

## **CONCLUSION**

Defendant's Motion for Judgment Notwithstanding the Verdict on Basis of Qualified Immunity (Doc. 123) is DENIED.

Dated at Rutland, in the District of Vermont, this 20th day of March, 2020.

*/s/* Geoffrey W. Crawford
Chief Judge
United States District Court